UNITED STATES of America,
Plaintiff–Appellee,

v.

William GADDIS and Barnetta Gaddis,
Defendants–Appellants.

Nos. 88–2278, 88–2317.

United States Court of Appeals,
Seventh Circuit.

Argued May 17, 1989.

Decided June 20, 1989.

L. Patrick Smith, Douglas D. Small, South Bend, Ind., for defendants-appellants.

James G. Richmond, U.S. Atty., Andrew B. Baker, Asst. U.S. Atty., Hammond, Ind., Richard A. Cook, Asst. U.S. Atty., South Bend, Ind., for plaintiff-appellee.

Before WOOD, Jr., and POSNER, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

PER CURIAM.

William Gaddis and Barnetta Gaddis, the defendants-appellants, appeal from their criminal convictions for conspiracy and postal money order alteration. Both appellants were charged with one count of criminal conspiracy in violation of 18 U.S.C. § 371 and seven counts of postal money order alteration in violation of 18 U.S.C. § 500. A jury found them guilty on all eight counts. The district court sentenced Barnetta Gaddis ("Barnetta") to three years imprisonment on the conspiracy count and one year imprisonment on each postal money order alteration count. The district court sentenced William Gaddis ("William") to two years and six months imprisonment on each count.

The appellants raise three distinct issues on appeal. First, William Gaddis contests the sufficiency of the evidence upon which he was convicted. Second, both William and Barnetta claim that the district court committed reversible error in allowing into evidence the government's exhibit 32 (an altered postal money order) and in allowing Perline Wilson Lloyd to testify about that exhibit. Finally, both appellants claim that their constitutional rights were violated when the district court failed to grant Barnetta's motion to preclude the government from calling her handwriting expert, retained under Rule 17(b) of the Federal Rules of Criminal Procedure, as a witness. For the reasons stated below, we affirm William's conviction, but remand Barnet-

ta's case back to the district court because we cannot determine from the current record whether Barnetta's rights were violated by the denial of her motion to preclude the government from calling her handwriting expert as a witness. On remand, we instruct the district court to hold an evidentiary hearing concerning the alleged filing of Barnetta's first Rule 17(b) motion so that the record can be more fully developed.

## I.  Statement of Facts

The facts of this case center on a conspiracy which involved prisoners at the Indiana State Prison in Michigan City and individuals outside the prison between March 1982 and December 1983. As part of this conspiracy, individuals outside the prison would purchase United States postal money orders for a nominal amount, usually $1.00, and then smuggle them into the prison by mail. At the prison, an inmate, Phillip Allen Field, would alter the amount of the money orders to a significantly higher value. These altered money orders were then smuggled out of the prison to be cashed. Some of the individuals who negotiated these altered money orders knew that the money orders had been altered, but others apparently did not. The proceeds from the altered money orders would either be smuggled back into the prison or used to buy drugs which would then be smuggled back into the prison.

During this time, William Gaddis was an inmate at the Indiana State Prison in Michigan City. Clinton Cole, a fellow inmate, would pick up $1.00 money orders from William and bring them to Field. Later, Cole would bring back altered money orders to William. In exchange for the altered money orders, William would give Cole drugs to take to Field.

While in prison, William corresponded with Ethyl Perkins who lived in Elkhart, Indiana. He sent Perkins between 15 to 20 money orders. He told her that they had been altered in the prison and that another individual would come by and pick them up. When that individual failed to show up, Perkins and Rose Wilson, the girlfriend of

an inmate at the prison, filled out three of the postal money orders in order to cash them with identification that Wilson had stolen. All three of these money orders were originally for $1.00, but had been subsequently altered to indicate a greater sum. William unsuccessfully tried to solicit Perkins to aid him in other illegal ventures. For example, he had asked Perkins to purchase $1.00 money orders for him, but she declined. He had also wanted Perkins to go to Indianapolis to obtain false identification from someone his sister, Barnetta Gaddis, knew so that Perkins could cash money orders with the false identification. Again, however, Perkins declined his request.

Prison officials suspected that William was involved in smuggling money orders, U.S. currency, and other contraband into the prison. Therefore, Charles Penfold, a correctional sergeant and investigator at the Indiana State Prison, inspected all mail for William. On March 23, 1982, William received a card in which two blank $1.00 money orders had been secreted. Written on the card were the words "Love you." Two days later, William received another card which similarly contained two blank $1.00 money orders. At trial, both the government's handwriting expert and Barnetta's handwriting expert stated that Barnetta probably did the writing on the card and envelopes.

Between August 1982 and March 1983, Linda Gaddis, who at that time was married to William and Barnetta's nephew, lived with Barnetta. At Barnetta's request, Linda filled out the front of a money order that Barnetta had given her with a false name and address and cashed it at the Merchants Bank. The money order was worth $300.00. Barnetta gave Linda $50.00, kept some of the money for herself, and indicated to Linda that she was going to send some money to William. Again upon Barnetta's requests, Linda subsequently cashed two additional altered money orders at the Merchants Bank, which she and Barnetta had filled out, and she gave the proceeds to Barnetta.

In October 1982, Merchants Bank contacted Linda and told her that there was a problem with the money orders she had cashed. When Linda informed Barnetta of this inquiry, Barnetta told Linda that they needed to make up a story about how they got the money orders. Barnetta decided that Linda should tell the bank that she won the money orders at a card game. Linda reiterated this phony story to Merchants Bank.

In November 1982, a postal inspector questioned Linda about the altered money orders. She told the postal inspector that she won the money orders in a card game and that she had received them from Barnetta. Linda eventually told Barnetta that she intended to tell the postal inspector the truth. Upon hearing this, Barnetta became upset and angry. At this point, Barnetta admitted to Linda that the postal money orders had been altered in prison.

Barnetta was involved in the cashing of four other altered money orders. Barnetta had filled out three altered money orders, collectively worth $1050.00, that were endorsed and cashed by her two sisters. Additionally, Barnetta negotiated another altered money order worth $300.00 that one of her sisters had filled out. When questioned by a postal inspector, Barnetta admitted that she cashed the $300.00 money order, but denied having any knowledge of the other six altered money orders that her sisters and Linda Gaddis had cashed.

Under a superseding indictment filed October 15, 1987, William Gaddis and Barnetta Gaddis were indicted along with twenty other individuals. William and Barnetta were each charged with one count of criminal conspiracy in violation of 18 U.S.C. § 371 [1] and seven counts of postal money order alteration in violation of 18 U.S.C.

§ 500. [2] After the district court granted various motions for severance, William and Barnetta were tried with their two sisters. A jury found William and Barnetta guilty on all eight counts. The district court sentenced William to two years and six months imprisonment on each count, with the sentences to run consecutively. The court sentenced Barnetta to three years imprisonment on the conspiracy count and one year imprisonment on each postal money order alteration count, with the sentences to run consecutively.

## II. Sufficiency of the Evidence

William Gaddis challenges the sufficiency of the evidence upon which he was convicted. In essence, he argues that there was no evidence to connect him to the seven postal money orders that Barnetta, his two other sisters, and Linda Gaddis had negotiated. He contends that he had no knowledge of this alleged conspiracy and did not intend to commit the crime of postal money order alteration.

■ A conspiracy is a combination of two or more individuals formed for the purpose of committing a criminal act through their joint efforts. *See United States v. Whaley*, 830 F.2d 1469, 1472 (7th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988); *United States v. Mayo*, 721 F.2d 1084, 1088 (7th Cir.1983). In order to convict William for conspiracy under § 371, the government needed to prove at trial: "(1) an agreement to accomplish an illegal objective against the United States; (2) one or more overt acts in furtherance of the illegal purpose; and (3) the intent to commit the substantive offense." *United States v. Hooks*, 848 F.2d 785, 792 (7th Cir.1988). The government, however, did not have to prove that

---

**1.** 18 U.S.C. § 371 provides in relevant part:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**2.** 18 U.S.C. § 500 provides in relevant part:

Whoever, with intent to defraud the United States, the Postal Service, or any person, transmits, presents, or causes to be transmitted or presented, any money order or postal note knowing the same—

(2) to contain any material alteration therein unlawfully made ...

Shall be fined not more than $5,000 or imprisoned not more than five years, or both.

William knew all the details of the conspiracy; it needed to show only that he knew of the conspiracy's essential objective. *United States v. Elledge*, 723 F.2d 864, 866 (7th Cir.1984). In order to convict William Gaddis for postal money order alteration, the government needed to prove that, with the intent to defraud, he presented, transmitted, caused to be presented, or caused to be transmitted a postal money order which he knew was materially altered. *See* 18 U.S.C. § 500.

■ Before we examine the evidence to determine whether the government met its burden at trial, it is important to note the standards under which we review William's conviction. William bears a heavy burden in trying to reverse his conviction for insufficient evidence. *See, e.g., United States v. Vega*, 860 F.2d 779, 792 (7th Cir.1988); *United States v. Ramirez*, 796 F.2d 212, 214 (7th Cir.1986). Initially, we review the evidence and draw all reasonable inferences in the light most favorable to the government. *E.g., Vega*, 860 F.2d at 793; *United States v. Nesbitt*, 852 F.2d 1502, 1509 (7th Cir.1988), *cert. denied*, — U.S. ——, 109 S.Ct. 808, 102 L.Ed.2d 798 (1989). After examining the evidence, we must affirm William Gaddis' conviction so long as any rational trier of fact could have found him guilty beyond a reasonable doubt. *See, e.g., id.; Ramirez*, 796 F.2d at 214. We can reverse William Gaddis' conviction only if the record contains no evidence from which a rational jury could have found him guilty beyond a reasonable doubt. *E.g., Vega*, 860 F.2d at 793; *Whaley*, 830 F.2d at 1473.

■ The record contains plenty of evidence to show William's involvement in the postal money order alteration conspiracy. Larry Campbell, an inmate at the prison, testified that William had given him an envelope containing seven postal money orders and asked him to deliver the envelope to another inmate. Tr. at 598. William had also told Campbell that he had sent some altered money orders to a woman in Elkhart, Indiana so that she could cash them; the proceeds were to be used for drugs. *Id.* at 602. Another inmate, Clinton Cole, testified that he picked up $1.00 money orders from William and returned money orders for a much higher value to William. *Id.* at 559. Cole further testified that he would deliver drugs to Field from William, which were payment for the money orders. *Id.* Moreover, Ethyl Perkins of Elkhart, Indiana testified that William sent her between 15 and 20 money orders and told her that they had been altered in prison. *Id.* at 656–57. He had also unsuccessfully tried to get her to purchase $1.00 money orders for him. *Id.* at 645.

Contrary to William Gaddis' claim, there was also ample evidence to connect him to the seven postal money orders that Barnetta, his two other sisters, and Linda Gaddis negotiated. William Gaddis admitted to Larry Campbell that he had altered money orders sent to his sister Barnetta to be cashed. *Id.* at 607. Campbell further testified that William would get one-third of the proceeds from those money orders. *Id.* at 608. Barnetta testified that she received seven blank postal money orders in the mail for William and that William had previously informed her that they would be coming. *Id.* at 913. One of the money orders clearly had inmate Field's fingerprint on it. *Id.* at 572. Additionally, the evidence shows that Barnetta's name and address were found on a slip of paper in Field's possession, *id.* at 351–53, and the government's handwriting expert positively identified William as the writer of Barnetta's name and address on this piece of paper, *id.* at 737. From all this evidence, we conclude that a rational jury could have found William guilty beyond a reasonable doubt.

We realize that much of the evidence against William is circumstantial. A conspiracy, however, by its nature is secretive, and direct evidence of the crime is usually unavailable. *See, e.g., Vega*, 860 F.2d at 793; *Nesbitt*, 852 F.2d at 1510. Therefore, on many prior occasions our court has stated that the government can use circumstantial evidence to show a conspiratorial agreement, *e.g., Elledge*, 723 F.2d at 865; *Mayo*, 721 F.2d at 1088, as well as a defendant's participation in the conspiracy, *e.g.,*

*Whaley,* 830 F.2d at 1473; *United States v. Xheka,* 704 F.2d 974, 988 (7th Cir.), *cert. denied,* 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983). Indeed, circumstantial evidence can be the *sole* support for a conspiracy conviction. *Vega,* 860 F.2d at 793–94; *Nesbitt,* 852 F.2d at 1510. Thus, we reject William Gaddis' claim that the government presented insufficient evidence to convict him.

### III. Exhibit 32 and the Testimony of Perline Wilson Lloyd

At trial, William Gaddis chose to testify on his own behalf. During the government's cross-examination of him, the government started to question William concerning its exhibit 32. This exhibit is an altered money order cashed in 1980 that was sent to William in care of Perline Wilson Lloyd. The government hoped to prove through the testimony of Lloyd that William knew that this money order had been altered, and thereby show that William had knowledge of the conspiracy prior to 1982. Thus, her testimony would rebut William's defense of lack of knowledge of the conspiracy. The defendants objected to the use of this exhibit at trial and to Lloyd's testimony as a witness on the ground that the government had failed to produce the money order during discovery in accordance with Rule 16 of the Federal Rules of Criminal Procedure. Although the district court denied their objections, it did give the jury a limiting instruction to consider this evidence against William only and not against his co-defendants. *See* Tr. at 1188, 1506–07.

After Lloyd had finished testifying, the district court re-evaluated its decision to allow her to testify. The district court then decided that Lloyd's testimony simply did not show that William knew that exhibit 32 was altered. Therefore, the district court granted William's motion to strike Lloyd's testimony, *see id.* at 1526–27, and it instructed the jury that they could "not consider it for any purpose . . . as though the testimony was not given," *id.* at 1531. The court also withdrew exhibit 32 "from the evidence to be sent to the jury room." *Id.* at 1533. Believing that its instruction cured any prejudice to the defendants, the district court denied their motions for a mistrial. *See id.* at 1530.

Both William Gaddis and Barnetta Gaddis argue that the district court committed reversible error in allowing into evidence exhibit 32 and the testimony of Lloyd. They contend that the government was obligated to turn this exhibit over to them before trial. They further argue that the district court's striking of the evidence and its admonishment to the jury not to consider the evidence was futile because irreparable injury had already taken place.

■ Specifically, William claims the government should have turned exhibit 32 over to him pursuant to Rule 16(a)(1)(A) of the Federal Rules of Criminal Procedure, which allows a defendant to inspect and copy "any relevant written or recorded statements made by the defendant." He claims that this money order is purportedly a statement made by him. Barnetta makes a similar claim. She argues that since any statement made by William, an alleged co-conspirator, is admissible against her under Rule 801(d)(2)(E) of the Federal Rules of Evidence, she had a right to those statements under Rule 16(a)(1)(A).

The appellants' arguments are without merit. Exhibit 32 is not a statement by William. We cannot find in the record any instance when the government claimed, or even suggested, that William had written something on the postal money order. By its very words, Rule 16(a)(1)(A) is simply inapplicable to a document that does not contain a statement by a defendant.

■ Alternatively, William contends that the government was obligated to produce the money order prior to trial pursuant to Rule 16(a)(1)(C) of the Federal Rules of Criminal Procedure, which allows a defendant to inspect and copy documents that "are material to the preparation of his defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant." William asserts that exhibit 32 was material to his defense and that it was obtained from, and belonged to, him.

It is difficult for us to see how exhibit 32 was material to William's defense. At trial, his defense was lack of knowledge of the conspiracy. Contrary to William's claim, lay or expert testimony could not establish his lack of knowledge as to the legitimacy of this particular money order. Furthermore, this exhibit would have to be *material* to his defense. *See United States v. United States Dist. Court*, 717 F.2d 478, 480 (9th Cir.1983) ("Materiality is a necessary prerequisite to discovery."). William has failed to show how this exhibit would have significantly helped in "uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment and rebuttal." *United States v. Felt*, 491 F.Supp. 179, 186 (D.D.C.1979).

Likewise, we reject his contention that the government obtained this exhibit from him or that it belonged to him. First, the government did not obtain the money order from William; rather, it obtained it from the records of the Postal Service. Second, the money order was not William's property. The money order was sent to Lloyd, made out in her name, and cashed by her. Thus, even though it may have been sent to Lloyd for William, under these circumstances we cannot say that the money order belonged to him. Moreover, even if the money order had belonged to William, at the time that the government obtained the money order Lloyd had already cashed it. Thus, the money order was no longer his property.

■ We also note that even if we were to agree with the appellants that the district court erred in allowing into evidence exhibit 32 and the testimony of Lloyd, the district court subsequently cured such error. First, the district court struck the testimony of Lloyd and exhibit 32 from the evidence. *See* Tr. at 1527, 1533. Second, the district court gave the following instruction to the jury:

> The testimony that you have just heard from Perline Wilson Lloyd I have ordered stricken from the record. That's been done with reference to other testimony and I'm confident that you can

follow the admonition.... You may not consider it for any purpose. I had told you before you could only consider it for a limited purpose. Now you may consider it for no purpose at all as though the testimony was not given.

*Id.* at 1531. We assume that a jury will follow a district court's instructions. *See United States v. Fulk*, 816 F.2d 1202, 1205 (7th Cir.1987); *United States v. Phillips*, 640 F.2d 87, 91 (7th Cir.), *cert. denied*, 451 U.S. 991, 101 S.Ct. 2331, 68 L.Ed.2d 851 (1981); *see also Greer v. Miller*, 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 3109 n. 8, 97 L.Ed.2d 618 (1987) ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it...."). "[W]e trust jurors to behave responsibly and to put aside as considerations bearing on their judgment matters that the judge tells them to put aside." *United States v. Mazzone*, 782 F.2d 757, 764 (7th Cir.), *cert. denied*, 479 U.S. 838, 107 S.Ct. 141, 93 L.Ed.2d 84 (1986). Therefore, the district court did not abuse its discretion in denying the appellants' motions for a mistrial because the district court's admonishment to the jury cured any alleged error.

### IV. Equal Protection and Due Process Claim

Both William Gaddis and Barnetta Gaddis claim that their constitutional rights were violated when the district court refused to preclude the government from calling Barnetta's handwriting expert, retained under Rule 17(b) of the Federal Rules of Criminal Procedure, as a witness. Unfortunately, there is not a clear factual record of the precise circumstances giving rise to this issue. However, based on the transcripts of the trial, the parties' briefs, an affidavit filed by Barnetta Gaddis' attorney, and the comments made by counsel at oral argument, we have managed to put together some of the pieces to this incomplete puzzle.

During pretrial discovery, Barnetta realized that the government was going to use a handwriting expert to testify that she had written on one of the cards and both envelopes that William Gaddis received in

prison. Thus, Barnetta searched for a handwriting expert of her own in order to rebut this testimony. After great difficulty, Barnetta located an expert, Richard L. Shipp, who was willing to provide assistance. Barnetta, however, could not afford to pay his fee. Therefore, she sought government financial aid in retaining Shipp pursuant to Rule 17(b) of the Federal Rules of Criminal Procedure.[3]

On or about August 6, 1987, Barnetta Gaddis' attorney, Douglas D. Small, allegedly filed a Rule 17(b) motion and a supporting memorandum in order to retain Shipp. Because Rule 17(b) allows for an "*ex parte* application," Small did not serve a copy of these documents on the government. Later that day, a law clerk for Judge Robert L. Miller, Jr. called Small. She told him that the motion was unacceptable and that he would have to serve a copy on the government. At oral argument, Small was unable to recall whether the law clerk indicated that she was acting pursuant to Judge Miller's request. Neither the record or the district court's docket sheet contains any reference to this alleged filing, or its rejection by the district court.[4]

The next day Small refiled the motion and supporting memorandum and served a copy of them on the government. The district court granted the motion, and Barnetta retained Shipp as her handwriting expert. From these documents, the government learned who Barnetta sought to retain as an expert and why she wished to retain him.

Shipp examined the cards and envelopes in the government's possession and determined that Barnetta was the probable author. As a result of this conclusion, Barnetta did not plan to call Shipp as an expert witness. At trial, however, the government asked Small if he intended to call Shipp as a witness. When Small stated that he would not be calling Shipp, the government indicated that it would call Shipp as a rebuttal witness against Barnetta. Small then made a motion for a mistrial or for an order precluding the government from calling Shipp as a witness. William apparently did not join in these motions. The district court denied both motions. The court, however, noted that it was not ruling that Shipp would be an appropriate rebuttal witness for the government to call since any ruling on that issue would be premature.

At this point, Barnetta was faced with the dilemma of either calling Shipp herself, in order to try to minimize the damaging nature of his testimony, or allowing the government to call him on rebuttal. As a tactical decision, Barnetta chose to call Shipp as a witness, and he testified that Barnetta was the probable author of the writing on one of the cards and on both envelopes.

### A. Barnetta's Constitutional Claim

■ On appeal, Barnetta argues that she was invidiously discriminated against because of her indigency in violation of the due process clause and the equal protection clause of the Constitution. She argues that a wealthy defendant can contact numerous experts without having to inform the government; only when the wealthy defendant intends to call an expert as a witness at trial does he need to notify the government about the expert. Thus, Barnetta claims that an indigent defendant should be able to retain an expert pursuant to Rule 17(b) without notifying the govern-

---

**3.** Federal Rule of Criminal Procedure 17(b) provides:

Defendants Unable to Pay. The court shall order at any time that a subpoena be issued for service on a named witness upon an *ex parte* application of a defendant upon a satisfactory showing that the defendant is financially unable to pay the fees of the witness and that the presence of the witness is necessary to an adequate defense. If the court orders the subpoena to be issued the costs incurred by the process and the fees of the witness so subpoenaed shall be paid in the same manner in which similar costs and fees are paid in case of a witness subpoenaed in behalf of the government.

**4.** It would be extremely helpful to our court if district courts would make a record of the fact that a filing has been rejected and the reasons for its rejection.

ment, unless the indigent defendant intends to call the expert as a witness.

Barnetta contends that the government found out about her expert solely because the district court erroneously required her to serve a copy of her 17(b) motion and supporting memorandum on the government. If she was not indigent, she would not have needed to file a 17(b) motion, and thus the government would not have found out about Shipp. Barnetta further argues that, contrary to the government's claim, the government would not have independently found out about Shipp because she would have had Shipp make a preliminary determination based on photocopies of the cards and envelopes which the government produced during discovery; thus, there would have been no need for Shipp to have contacted the government to see the originals. Therefore, Barnetta argues that the district court should have precluded the government from calling Shipp as a witness, and its failure to do so violated her constitutional rights because a wealthy defendant would never find himself in this predicament.

Of course, the government strongly contests Barnetta's claim that her constitutional rights were violated. The government argues that the district court properly refused to make an advanced ruling on rebuttal testimony. The government further argues that because the district court did not make a definitive ruling on whether the government could call Shipp as a rebuttal witness, Barnetta waived her right to appeal this issue by calling Shipp as a witness at trial. Finally, the government claims that if the district court erred, such error was harmless.

Barnetta raises a very serious and important issue. Unfortunately, because the record is incomplete, we cannot give a proper resolution to this thorny issue. Therefore, we remand Barnetta's case back to the district court and instruct the court to hold an evidentiary hearing concerning the alleged filing of Barnetta's first Rule 17(b) motion. Hopefully, in this evidentiary hearing, the district court will be able to elicit information which will provide answers to the following questions: (1) Did Barnetta's counsel try to file a Rule 17(b) motion in an *ex parte* manner? (2) With whom did he try to file it, and what action was taken? (3) Did the district court judge authorize his law clerk to reject this filing? (4) Why was this filing rejected? Other similar relevant questions may also be answered at the discretion of the district judge. At this evidentiary hearing, the district court should feel free to state on the record his own recollection of relevant evidence, and he need not disqualify himself on this ground. Our panel shall retain jurisdiction over Barnetta's case; therefore, the district court should submit the transcript of the hearing and its findings to our court so that we can properly dispose of Barnetta's appeal on this issue.

### B. William's Constitutional Claim

■ William claims that his constitutional rights were also violated by the district court's denial of Barnetta's motion to preclude the government from calling Shipp as a witness.[5] He argues that because the cards were addressed to him, Shipp's testimony was highly prejudicial to him. William's contention is without merit.

First, at trial William apparently did not join in Barnetta's motion to preclude the government from calling Shipp as a witness. The failure of William to raise this issue in the district court results in a waiver of it on appeal. *See United States v. Muskovsky*, 863 F.2d 1319, 1323 (7th Cir. 1988), *cert. denied*, — U.S. —, 109 S.Ct. 1345, 103 L.Ed.2d 813 (1989); *United States v. Carter*, 720 F.2d 941, 945 (7th Cir.1983).

■ Second, even if William did not waive this issue on appeal, we would still reject his claim. William has failed to show that he was discriminated against because of his indigency. William would be in the exact same position even if he

---

5. At oral argument, counsel for William Gaddis conceded that even if the district court erred in requiring disclosure of Barnetta's expert to the government, this error would not aid William in his appeal. However, because William argues this issue in his brief, we shall address it.

were a wealthy defendant. He cannot obtain a reversal of his conviction based on Barnetta's rights. Even if the district court made an error concerning Barnetta, that error does not automatically apply to William. William was only entitled to a fair trial, not a perfect one. *See Rose v. Clark,* 478 U.S. 570, 579, 106 S.Ct. 3101, 3107, 92 L.Ed.2d 460 (1986); *Vega,* 860 F.2d at 801.

## V. Conclusion

For all the foregoing reasons, we AFFIRM the conviction of William Gaddis. We REMAND Barnetta's case back to the district court and instruct the district court to hold an evidentiary hearing to develop the record more fully concerning the alleged filing attempt of Barnetta's first Rule 17(b) motion. Our panel shall retain jurisdiction over Barnetta's case. Therefore, after holding the evidentiary hearing, the district court should submit the transcript of the hearing and its findings to our court so that we can dispose of Barnetta's appeal.